***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Gregory. The parties waived oral arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or to amend the prior Opinion and Award. Accordingly, the Full Commission affirms and adopts the Deputy Commissioner's holding and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. At all times relevant hereto, the parties were bound by and subject to the provisions of the Workers' Compensation Act, the defendant-employer regularly employing three or more employees.
2. As of May 15, 2002, the employer-employee relationship existed between the plaintiff-employee and the defendant-employer.
3. As of May 15, 2002, the defendant-employer was a qualified self-insurer with Risk Management Services, Inc. acting as its administrator.
4. As of May 15, 2002, the plaintiff's average weekly wage was $417.14, producing a compensation rate of $278.11.
5. By I.C. Form 63 filed on or about June 7, 2002, the defendants gave notice of payment of compensation to the plaintiff without prejudice. Defendants thereafter did not deny the employee's claim within the time period established by N.C. Gen. Stat. § 97-18(d).
6. Defendants have paid plaintiff weekly benefits, at the rate of $278.11, for the following periods: May 16, 2002 through July 14, 2002; and July 17, 2002 to the present and continuing. Plaintiff was also paid temporary partial disability benefits for July 15 and 16, 2002, when he returned to work on light duty for the employer.
 ***********
Based upon the evidence of record, the Full Commission enters the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 35 years old with a date of birth of May 13, 1968 and he had obtained a G.E.D. In addition, plaintiff attended classes in business construction, carpentry, masonry and blueprint reading at Granville Community College.
2. Prior to his employment with defendant-employer, plaintiff's work experience included positions in fast food restaurants, manufacturing facilities, other grocery stores, and construction, with much of the employment for short periods of time. Plaintiff also held positions through various temporary employment agencies. In addition, between 1995 and 2001, plaintiff was self-employed with Royster's Home Improvement. Plaintiff operated Royster's Home Improvement with his brother, and their business provided services building, renovating and remodeling houses, and performing light repair work. Despite plaintiff's admission that he earned income from his self-employment with Royster's Home Improvement, his social security record of earnings report did not reflect any earnings from that position, which plaintiff attributed to his sister-in-law filing his tax returns.
3. After Royster's Home Improvement experienced a reduction in business, plaintiff began working as a selector at defendant-employer's Butner distribution center on February 25, 2002. The Butner distribution center processed health and beauty items sold in Food Lion grocery stores. In his position as a selector, plaintiff was responsible for filling orders submitted by grocery stores, placing the orders on a pallet-jack and packaging them, and transporting them via pallet-jack, which is essentially a motorized scooter, to the front of the warehouse for transportation.
4. Plaintiff had been employed for less than three months with defendant-employer on May 15, 2002, when he parked his pallet-jack near the punch-clock and stood by the punch-clock waiting to pick up an order. While plaintiff was standing by the punch-clock, a co-employee moved plaintiff's pallet-jack and plaintiff was struck in the side by the pallet-jack, and fell to the floor against a metal pole.
5. Following the accident, plaintiff was transported by security personnel to Butner-Creedmoor Family Medicine where he was treated by Dr. John M. Aquino. Plaintiff reported discomfort in the right lumbar area, but did not express any complaints of pain radiating into his legs, or any urinary complaints. On physical exam, Dr. Aquino noted that plaintiff appeared to be in no acute distress and there were no visible contusions or breaks in his skin. Dr. Aquino diagnosed plaintiff with a lumbar contusion, recommended that he apply ice and heat to the areas of the body that were tender, and instructed him to take Ibuprofen as necessary and to return if he did not improve.
6. Plaintiff returned to Dr. Aquino on May 21, 2002, and advised that his back remained sore. Plaintiff also complained of discomfort centered predominantly in his left mid to upper lumbar area and pain radiating into his left buttock, but denied that the pain extended below this level. On physical exam, Dr. Aquino noted some spasm in plaintiff's lumbar musculature and that he was tender in his left lumbosacral paraspinal musculature, and diagnosed plaintiff with a lumbar contusion with spasm, recommended that he continue applying heat and engage in stretching exercises and that he continue taking Anaprox DS and Flexeril, and referred him to physical therapy. Dr. Aquino also instructed plaintiff to return in one week for evaluation, and removed him from work until that time.
7. On May 22, 2002, plaintiff underwent x-rays of his lumbar spine, which revealed mild anterior wedging of the L1 vertebra indicative of a fracture of indeterminate age. Plaintiff returned to see Dr. Aquino on May 28, 2002, and when plaintiff reported that his back had not improved, Dr. Aquino referred him to Dr. Michael M. Zilles of Duke University Medical Center. Apparently believing that no light duty work was available with defendant-employer, Dr. Aquino removed plaintiff from work until he was seen by Dr. Zilles. Thereafter, on May 30, 2002, Dr. Aquino clarified that plaintiff could return to work, but restricted him from engaging in bending, lifting, reaching, prolonged sitting, standing or walking until he was seen for an orthopedic consult. However, plaintiff made no effort to return to work.
8. On June 5, 2002, Dr. Zilles saw plaintiff and diagnosed him with a low back sprain. Dr. Zilles also removed plaintiff out of work because plaintiff related that no light duty work was available. However, shortly thereafter, Dr. Zilles learned that defendant-employer had light duty work available, and he suggested that plaintiff should be able to perform light duty work after his next appointment.
9. By I.C. Form 63 filed June 7, 2002, defendant-administrator gave notice of payment of compensation without prejudice to plaintiff, and payments were made based upon an average weekly wage of $417.14 and a weekly compensation rate of $278.11.
10. Plaintiff began physical therapy on June 11, 2002. The physical therapist, Jorn Larsen, noted that plaintiff appeared to be in some discomfort and that he moved about slowly and in a guarded manner.
11. Dr. Zilles next treated plaintiff on July 3, 2002. Dr. Zilles diagnosed plaintiff with a low back strain, advised him to continue physical therapy, and wrote him out of work for four weeks due to his continued complaints of pain. However, Dr. Zilles wanted plaintiff to return to light duty work soon.
12. After eight visits to Triangle Orthopedic Physical Rehabilitation Center, plaintiff completed his physical therapy on July 10, 2002. During the course of his physical therapy visits, plaintiff continued to complain of pain and discomfort and reported a lack of improvement in his condition. The notes from plaintiff's last visit on July 10, 2002 indicate that he continued to ambulate in a somewhat slow and guarded manner, but did not have increased pain with his exercises.
13. At the direction of Dr. Zilles, plaintiff returned to light duty work with defendant-employer on July 15, 2002. The light duty work was in the quality control department and required plaintiff to put store returns back in place and to look up lost and found products. In the performance of these tasks, plaintiff lifted small boxes, moved some boxes with a stick, stood, walked, and occasionally kneeled. Based on the evaluation of his physicians, plaintiff was capable of performing this work. Nevertheless, on July 16, 2002, plaintiff removed himself from work and sought treatment at the emergency room at Granville Medical Center, where he was diagnosed with chronic back pain and released to return to work light duty. However, plaintiff made no effort to return to work.
14. On July 17, 2002, plaintiff returned to Dr. Zilles and advised that he had attempted to return to work, but that his pain had become worse and he had sought treatment at the emergency room. After a physical exam, Dr. Zilles diagnosed plaintiff with a chronic lumbar strain, referred him for a MRI to rule out a degenerative disc, and removed him from work temporarily. The results of the MRI showed moderate degenerative disc disease at the L3-L4 and L4-L5 levels, but were negative for a disc herniation and stenosis.
15. Plaintiff was treated by Dr. Gary Smoot of Carolina Spine Specialists on July 18, 2002. Dr. Smoot reviewed plaintiff's x-rays and the MRI, performed a physical exam, and indicated that there was no evidence of any neurological compromise.
16. Despite a lack of evidence of any neurological problem and releases to return to work, plaintiff remained out of work. Plaintiff did not make a reasonable effort to return to work and his complaints of pain are not supported by the greater weight of the evidence of record. Nevertheless, efforts to further evaluate plaintiff's complaints were made.
17. By letter dated October 21, 2002, plaintiff through his attorney was provided with job descriptions for and notice of the transitional jobs available with defendant-employer.
18. Plaintiff was seen on October 22, 2002 by Dr. Robert E. Price, who has been licensed as a neurosurgeon since 1974, has taught for the past 15 years as an associate clinical professor in the area of neurosurgery at Duke University Medical Center, and has a practice that is primarily concentrated in addressing conditions of the spine. Dr. Price examined plaintiff, obtained a history from plaintiff and reviewed plaintiff's MRI, which he noted showed very minimal degenerative disc disease at the L3-L4 and L4-L5 levels. Dr. Price diagnosed plaintiff with chronic low back pain and recommended lumbosacral films, a myelogram and CT myelogram in order to rule out a ruptured disc and confirm nothing had been missed or overlooked with respect to the previous work-up of plaintiff's back condition. Dr. Price removed plaintiff from work pending completion of the studies.
19. On November 7, 2002, the diagnostic studies were performed and showed a L4-L5 bulge eccentric to the left, but no spinal stenosis, nerve root defects, or herniation. Plaintiff returned to Dr. Price on November 12, 2002, at which time it was noted that the myelogram and lumbar myelogram CT scan were completely within normal limits, and that plaintiff's symptom complaints were disproportionate to and not supported by the findings contained in the MRI, myelogram, and CT myelogram. Accordingly, Dr. Price recommended work hardening and a functional capacity evaluation.
20. Plaintiff initially refused to report to work hardening, in part, due to a purported inability to obtain transportation. In addition, plaintiff made no effort to return to work and instead, he contacted defendant-employer on December 28, 2002, and advised that he was quitting his employment. Thereafter, a separation notice was prepared reflecting that plaintiff had voluntarily quit his position. But for plaintiff quitting his position, defendant-employer would have allowed him to return to work in his regular position or in the transitional jobs offered to him in October 2002.
21. By letter dated February 11, 2003, defendant-administrator requested that Dr. Price state whether he anticipated that plaintiff would have an impairment rating and restrictions. Dr. Price responded that he did not anticipate that plaintiff would have any impairment rating or restrictions.
22. On February 25, 2003, the nurse case manager contacted Dr. Price and reported that plaintiff had refused to undergo work hardening, or attend a second opinion evaluation, and inquired whether a functional capacity evaluation was appropriate. Dr. Price advised the nurse case manager that he did not believe that there was a structural problem to account for plaintiff's symptoms, and that plaintiff should proceed with the functional capacity evaluation.
23. Plaintiff was next seen by Dr. Price on March 4, 2003. At that appointment, plaintiff reported continued difficulty with back pain, but no real difficulty with pain radiating down his leg. Dr. Price noted that plaintiff remained seated in a slumped position, but that he was able to get up from the chair without any difficulty. In addition, Dr. Price noted that plaintiff was able to walk and bend at the back without any apparent difficulty or pain. Dr. Price concluded that plaintiff was magnifying his symptoms and that plaintiff was not a surgical candidate. As a treatment plan, Dr. Price recommended work hardening, because of plaintiff's deconditioned state, and a second opinion.
24. After learning that plaintiff contended that he could not attend the work hardening program because of a lack of transportation, defendant-administrator made arrangements for transportation to the program. Plaintiff began the work hardening program with Brian Diaz at Southwind Spine Rehabilitation Center April 4, 2003. Mr. Diaz has a master's in physical therapy; training in the performance of functional capacity evaluations, and his area of expertise is in physical therapy and rehabilitation of injuries of the spine and administering functional capacity evaluations.
25. At the outset of the program, plaintiff advised Mr. Diaz that he could not work and that he did not wish to return to work at that time. During the work hardening program, plaintiff had variable levels of participation but overall plaintiff refused to put forth a full effort. Examples of plaintiff's failure to give a full effort documented by Brian Diaz and other therapists in the work hardening program include the following: (1) subjective complaints of pain by plaintiff which failed to match his diagnosis; (2) plaintiff's failure to complete one repetition on the weight machine for his legs when the pin was removed despite the fact that he was able to get up and down from a chair, which would have required greater effort and force; (3) plaintiff's report that he could not lift his leg six inches from the bottom of the pool while in a gravity eliminated position; (4) plaintiff's failure to accurately report the amount of weight he was able to lift by documenting that he was lifting less weight than he was actually able to lift; and, (5) extended periods of time to complete exercises by plaintiff, when he should have been able to complete the exercises in a short period of time.
26. Plaintiff's attendance at the work hardening program was sporadic, and he missed several appointments to attend to personal matters. For example, plaintiff left a physical therapy session early with his daughter for an alleged financial emergency; failed to report for physical therapy sessions because he experienced a minor scratch on his leg; and reasonably missed an appointment because he had to appear in court for a child support issue. Plaintiff also misrepresented the basis for his failure to report to physical therapy on May 12, 2003. On that occasion, plaintiff telephoned to report that he could not attend the physical therapy session because his transportation did not arrive. However, the physical therapist later received a phone call from Black Diamond Transportation and was advised that plaintiff told the driver to leave because he was not feeling well.
27. During the functional capacity evaluation completed by plaintiff as part of the work hardening program, plaintiff claimed that he was unable to complete tasks that he was able to complete during the work hardening program, tested lower on the functional capacity evaluation than he tested during the work hardening program, and at best gave a poor effort. The greater weight of the evidence demonstrates that plaintiff refused to give full effort during the program and the functional capacity evaluation, and that the results of the functional capacity evaluation are not an accurate portrayal of plaintiff's abilities. Plaintiff's efforts throughout the work hardening program were variable at best, his subjective complaints did not match the objective findings, and his efforts were not representative of his capabilities. Plaintiff's conduct prevented an accurate assessment of his physical abilities and return to work capability. Plaintiff's conduct amounted, at a minimum, to a refusal to cooperate with medical treatment.
28. Following completion of the work hardening program and functional capacity evaluation, plaintiff returned to Dr. Price on May 16, 2003. At that appointment, Dr. Price reviewed the notes of the work hardening program and functional capacity evaluation, and noted that the inconsistencies and problems documented during the program were consistent with his opinion that plaintiff's complaints were significantly disproportionate to his findings on physical exam. Based upon the diagnostic studies performed, his observations on physical exam, review of the notes from the work hardening program and functional capacity evaluation, and his education, training and experience, Dr. Price opined that plaintiff suffered at most a lumbar sprain that should have long since resolved prior to his discharge of plaintiff on May 16, 2003; that there were no objective findings to support plaintiff's subjective complaints of pain and the cause of his pain was unknown; that plaintiff was capable of performing the transitional jobs offered by defendant-employer and of performing more strenuous activity than the results of the functional capacity evaluation suggested; and that Dr. Price was unable to accurately assess plaintiff's work abilities because of his failure to give a full effort in the work hardening program and functional capacity evaluation. Dr. Price also reiterated that plaintiff was not a candidate for surgery, and recommended that he undergo a second opinion evaluation with Dr. Scott Sanitate. In an addendum report dated May 27, 2003, Dr. Price again stated that plaintiff was able to return to at least sedentary work, and that plaintiff had reached maximum medical improvement and did not qualify for any permanent partial disability rating.
29. Plaintiff was referred for a second opinion evaluation with Dr. Scott Sanitate, who has been licensed to practice medicine in North Carolina since 1992 and is board certified in physical medicine, rehabilitation, electrodiagnostic medicine and acupuncture. Dr. Sanitate's practice is concentrated in the area of physiatry. At plaintiff's evaluation on July 2, 2003, Dr. Sanitate reviewed plaintiff's history and reports of the diagnostic studies, and performed a physical exam. Dr. Sanitate noted that during plaintiff's physical exam that his movements were very slow, he appeared to be more alert in the lobby than in the examination room, his complaints of pain were inconsistent, his lower and upper extremity strength examinations were inconsistent, and that he tested positive on three out of five possible Waddel signs suggesting a non-organic component of his pain. Like Mr. Diaz and Dr. Price, Dr. Sanitate concluded that there was no correlation between the diagnostic studies and plaintiff's subjective complaints of pain; that his presentation was inconsistent; and that he would have expected any injury that plaintiff might have experienced to have long since resolved. Dr. Sanitate also stated that there was most likely an element of secondary gain in this case. Because of the inconsistencies demonstrated by plaintiff during his evaluation, Dr. Sanitate recommended a psychological evaluation, which he was clear was unrelated to any work incident.
30. Dr. Sanitate reviewed a copy of the job descriptions for the transitional positions offered to plaintiff, and indicated that plaintiff could perform all of those positions at the time of his evaluation. Dr. Sanitate stated that it was possible that plaintiff's performance of those positions could have aided his recovery and reduced his disability.
31. Plaintiff was seen on August 20, 2003 for a second opinion on permanent partial disability by Dr. Ronald Easley of Accident Injury Urgent Care Medical Center. The evaluation lasted approximately one hour, and approximately one-half hour was devoted to the physical exam. At the evaluation, Dr. Easley reviewed portions of the records of previous medical treatment, and the MRI and CT myelogram. The report prepared by Dr. Easley at the time of the evaluation stated that plaintiff had sustained an unspecified back injury as a result of the May 15, 2002 accident, and that the disc bulges at the L3-L4 and L4-L5 levels merited a 10% permanent partial impairment rating. During his deposition on June 9, 2004, and based on the information he obtained at plaintiff's one-time visit fifteen months after the incident giving rise to this claim, Dr. Easley stated that the disc bulges at the L3-L4 and L4-L5 levels could have been caused by the May 15, 2002 accident, and were the cause of plaintiff's pain; and that plaintiff was capable of work with restrictions of no walking more than thirty minutes, limited repetitive bending, and no lifting greater than ten pounds.
32. Dr. Easley admitted that orthopedics and neurology were not his areas of expertise, which consist of internal medicine and endocrinology. In addition, Dr. Easley had not been provided Dr. Sanitate's medical records, notes from the work hardening program, or the report for the functional capacity evaluation, and he performed no testing to assess plaintiff's physical abilities or verify his representations of his physical abilities. Dr. Easley further admitted that the disc bulges shown in the diagnostic studies could have been caused by the natural degeneration of plaintiff's spine, and he could not state to a reasonable degree of medical certainty what caused those problems. Dr. Easley's opinion on causation was based primarily upon plaintiff's representations that he did not have pain prior to May 15, 2002. Dr. Easley's opinions are based upon inaccurate assumptions and information, and are not supported by the evidence and are therefore afforded little weight. The other physicians who treated plaintiff, including Dr. Price and Dr. Sanitate, have better qualifications to assess plaintiff's condition, and their opinions are more credible and are afforded greater weight than those of Dr. Easley. The testimony and opinions of Dr. Price are credible regarding plaintiff's medical condition, physical abilities, and ability to work after May 16, 2003 as he treated plaintiff closer in time to the incident in question, had a greater opportunity to observe plaintiff and assess his injuries, and, unlike Dr. Easley, specializes in the care and treatment of spinal injuries.
33. The greater weight of the evidence demonstrates plaintiff suffered at most a lumbar back sprain as a result of the May 15, 2002 accident, and his injury was resolved and he had reached maximum medical improvement, with no permanent disability, by no later than May 16, 2003. The greater weight of the evidence fails to support plaintiff's claim that he suffered any disabling pain after May 16, 2003.
34. Despite medical evidence which makes it clear that plaintiff is capable of doing more than sedentary work, plaintiff has made no effort to return to work with defendant-employer since July 2002, and has not applied for any positions with other employers. Furthermore, but for plaintiff quitting his employment with defendant-employer on December 28, 2002, plaintiff could have returned to work in his regular job or in the transitional job duties.
35. Beginning no later than May 16, 2003, plaintiff was capable of returning to work. Plaintiff's refusal to work after May 16, 2003 was unjustified, because he was provided with suitable work by defendant-employer and he was physically able to perform that work, but nonetheless voluntarily quit his job. Plaintiff has also unreasonably refused to seek any work since May 16, 2003.
36. Plaintiff has not been disabled within the meaning of the Act at any time after May 16, 2003. However, plaintiff has received temporary total disability benefits continuing after that date. Plaintiff has reached maximum medical improvement as of no later than May 16, 2003 and retains no permanent partial impairment.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff suffered a compensable injury by accident arising out of the course and scope his employment on May 15, 2002. As a result of that accident, plaintiff suffered at most a lumbar sprain or strain, which based upon the greater weight of the evidence had completely resolved no later than May 16, 2003, when plaintiff was released at maximum medical improvement and provided with a 0% permanent partial impairment rating by Dr. Price. N.C. Gen. Stat. § 97-2.
2. Plaintiff has failed to prove that he has been disabled within the meaning of the Act as a result of the May 15, 2002 accident at any time after May 16, 2003. Russell v. Lowes Prod. Distrib., 108 N.C. App. 762,425 S.E.2d 454 (1993).
3. Plaintiff's claim for disability benefits after May 16, 2003 also fails because of his failure to attempt suitable employment offered to him by defendant-employer. N.C. Gen. Stat. § 97-32 provides that an injured employee who refuses "employment procured for him suitable to his capacity shall not be entitled to any compensation at any time during the continuance of the refusal." N.C. Gen. Stat. § 97-32; Peoples v. ConeMills Corp., 316 N.C. 426, 342 S.E.2d 798 (1986).
4. Finally, plaintiff has failed to comply with N.C. Gen. Stat. § 97-25, which requires that an employer provide medical compensation for accepted claims, and that an employee submit to all medical, hospital, surgical or other treatment or rehabilitative procedure when ordered by the Industrial Commission. Id. The purpose of this statute is to facilitate the return of employees to gainful employment by requiring that employers provide them with necessary medical, hospital, surgical, rehabilitative or other treatment, and requiring that employees cooperate with the treatment plan prescribed by their medical care provider. See Johnson v.Jones Group, Inc., 123 N.C. App. 219, 225, 472 S.E.2d 587 (1996).
5. While defendants paid plaintiff benefits after May 16, 2003, plaintiff did not sustain a permanent partial disability, and therefore defendants' entitlement to a credit is limited under the Act. N.C. Gen. Stat. § 97-42.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Defendants are hereby permitted to terminate any further weekly benefit payments to plaintiff. Furthermore, plaintiff's claim for any additional disability benefits under the Act must under the law be, and the same is hereby DENIED.
2. While the greater weight of the evidence of record demonstrates that plaintiff is not currently in need of additional medical treatment, plaintiff is nevertheless hereby ordered to cooperate fully with N.C. Gen. Stat. § 97-25.
3. Each side shall pay its own costs of this appeal.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/_____________ PAMELA T. YOUNG COMMISSIONER
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER